UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
LEFKIOS ANTONIOU,

                Plaintiff,

        -against-

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.
----------------------------------------X

**MEMORANDUM & ORDER**
10-CV-1234 (KAM)

**MATSUMOTO, United States District Judge:**

        Pursuant to 42 U.S.C. Section 405(g), plaintiff Lefkios Antoniou ("plaintiff") appeals the final decision of defendant Commissioner of Social Security Michael Astrue ("defendant" or "Commissioner") denying plaintiff's application for Social Security Disability Insurance Benefits ("SSD") under Title II of the Social Security Act (the "Act"). Plaintiff, who is represented by counsel, contends that he is disabled and therefore entitled to receive SSD benefits due to a combination of severe impairments of "medical, orthopedic, and psychiatric" natures, which have prevented him from obtaining gainful employment since August 16, 2006. (ECF No. 1, Complaint, dated 3/18/2010 ("Compl.") ¶¶ 5-6.) Presently before the court are plaintiff's and defendant's cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons set forth below, both plaintiff's and

defendant's motions are denied and the case is remanded for further proceedings.

## BACKGROUND

### I.   Plaintiff's Personal and Employment History

Plaintiff was born on April 12, 1946 in the Republic of Cyprus and moved to the United States on December 6, 1975. (Administrative Transcript ("Tr.") at 26.)  Plaintiff obtained his high school education in Cyprus, where he also received vocational training in air conditioning and heating work.  (*Id.* at 26-27.)  Plaintiff reported that he ran his own air conditioning and heating system repair business in the United States for 25 years.  (*Id.* at 27.)  His job often involved climbing through "moving ladders," working on roofs, and lifting heavy objects.  (*Id.* at 27-28, 36.)  Plaintiff testified that he regularly lifted 40 to 50 pounds in this capacity and that, depending on the job, "[he] need[ed] a lot of help" to lift some of the objects, which were "really heavy."  (*Id.* at 27-28, 36.)

On or about August 16, 2006, plaintiff stopped working in air conditioning and heating repair after reportedly experiencing several instances of choking feelings, disorientation, and fear while working on rooftops.  (*See id.* at 27-28, 39.)  Plaintiff testified that from the time he stopped working until he turned 62 and began to collect retirement benefits, he lived off his savings.  (*Id.* at 39.)  When his

savings ran out, he terminated his insurance plan and, as a result, could not afford to obtain treatment for any of his medical conditions.  (*Id.* at 30, 39.)

In 2007, at his therapist's suggestion, plaintiff traveled to Cyprus, where he believed the cost of living would be cheaper and he could receive free medical treatment.  (*Id.* at 33, 39-40.)  In Cyprus, plaintiff lived with his mother.  (*Id.* at 40.)  On a typical day, his brother drove him to the beach, where plaintiff would swim and relax.  (*Id.*)  Plaintiff testified that he lived in Cyprus for a year and a half, but traveled back and forth between the United States and Cyprus during that time.  (*Id.* at 39-40.)  Plaintiff married his second wife in Cyprus in 2007, but the couple divorced in 2009.[1]  (*See id.* at 40, 308.)

Plaintiff testified that he currently lives in his daughter's home in Whitestone, New York, where his bedroom is on the second floor.  (*Id.* at 1, 35, 38.)  The stairway to the second floor has ten steps that plaintiff walks up and down once per day.  (*Id.* at 38.)  His daughter cooks and cleans, and plaintiff occasionally goes shopping alone.  (*Id.* at 35.)  When the shopping bags are "too much then [his daughter] goes with [him]."  (*Id.* at 36.)

---

[1] Plaintiff's first wife passed away from cancer in 2001.  (Tr. at 32, 308.)

## II.  Plaintiff's Medical History

### A. January 31, 2005: Cardiac Stent Replacements

In 2005, plaintiff was referred to the New York Hospital Medical Center of Queens ("Medical Center") by his primary care physician, Dr. Daniel Byrns, after experiencing acute dyspnea while swimming.  (*Id.* at 232.)  On January 31, 2005, plaintiff underwent a dual-isotope exercise myocardial perfusion imaging study and a cardiac stress test at the Medical Center.  (*Id.* at 230-32.)  Dr. David Schechter, plaintiff's treating cardiologist at the Medical Center, noted that plaintiff had a history of hypertension, remote small CVA with chronic neck discomfort, and rare ventricular couplets during stress.  (*Id.* at 232.)  The test results showed that plaintiff had a normal exercise capacity, but also revealed myocardial ischemia.  (*Id.* at 230, 232.)  A coronary angiogram and catheterization, also performed on January 31, 2005, confirmed that plaintiff suffered from triple vessel coronary heart disease.  (*Id.* at 42, 58, 239-40.)

At Dr. Schechter's recommendation, on January 31, 2005, plaintiff underwent a procedure to place three stents in his heart.  (*Id.* at 240-41.)  On May 6, 2005, two more stents were inserted.  (*Id.* at 243.)  Dr. Schechter's final diagnosis on May 6, 2005 was two-vessel coronary artery disease, with intervention attempted in two lesions present in both vessels,

and both lesions dilated.  (*Id.* at 244.)  Plaintiff was to undergo a follow-up catheterization in three months.  (*Id.*)

### B. August 1, 2005 to August 11, 2006: Follow-up Catheterizations and Cardiac Examinations

On August 1, 2005, a cardiac catheterization revealed that plaintiff had non-significant coronary artery disease ("CAD") and patent stent sites.  (*Id.* at 172.)  Continuing medical therapy was recommended.  (*Id.*)  On a post-stent placement follow-up appointment on September 29, 2005, Dr. Schechter reported that plaintiff presented with diagnoses of arteriosclerotic heart disease, lipidemia, hypertension, and impotence.  (*Id.* at 277.)  Plaintiff's medications included Viagra, Ecotrin, Plavix, Zocor, and Niaspan.  (*Id.*)  Plaintiff informed Dr. Schechter that he was asymptomatic and had good functional capacity.  (*Id.*)  Dr. Schechter also noted that plaintiff was comfortable and in good spirits and his heart sounds were normal.  (*Id.*)  In addition, an examination of plaintiff's extremities revealed no edema.  (*Id.*)  Dr. Schechter opined that there was no evidence of recurrent angina or congestive heart failure.  (*Id.*)  Dr. Schechter cleared plaintiff for airplane travel and told him to return for a follow-up appointment in three months.  (*Id.*)

At his next appointment with Dr. Schechter on January 10, 2006, plaintiff reported that he continued to have good

functional capacity without any chest pain, dyspnea,
palpitations, or syncope. (*Id.* at 279.) Plaintiff's cardiac
examination was normal. (*Id.*) Plaintiff reported that he
sometimes skipped taking his Plavix medication because he
believed it upset his stomach. (*Id.*) Dr. Schechter instructed
plaintiff that he should not stop taking Plavix and that, if his
stomach continued to bother him, he should decrease his daily
aspirin dosage. (*Id.* at 280.) Dr. Schechter also instructed
plaintiff to take Protonix in the morning. (*Id.*) Dr. Schechter
diagnosed status-post eluting stents, elevated lipoprotein (a)
and lipidemia with adequate control, and controlled
hypertension. (*Id.* at 279.) Dr. Schechter's impression was
that plaintiff remained asymptomatic following the multi-vessel
stenting in May 2005. (*Id.* at 280.)

    In a letter addressed to Dr. Byrns dated July 18,
2006, Dr. Schechter noted that although plaintiff's blood
pressure was borderline elevated, plaintiff had normal heart
sounds, patent vessels with no significant obstructive disease,
an absence of edema, and that plaintiff was "feeling well and
living an active life without symptomatology." (*Id.* at 278.)
In addition, Dr. Schechter wrote that he advised plaintiff to
lose weight in order to lower his blood pressure prior to
starting an anti-hypertensive medication. (*Id.*) Dr. Schechter

noted that a catheterization was planned for early August to reassess whether there was any in-stent stenosis.  (*Id.*)

On August 11, 2006, a follow-up left heart catheterization, left ventriculography, aortogram, and coronary angiography were performed at the Medical Center.  (*Id.* at 167-68.)  These tests showed non-significant vessel disease with previous PCI and patent stent RCA, CFX and LAD and normal left ventricular function.  (*Id.*)  Continued medical therapy and secondary prevention measures were recommended.  (*Id.*)

## C. March 21, 2006 to March 20, 2007: Early Visits with Dr. Byrns

On March 21, 2006, plaintiff saw Dr. Byrns, his internist, with complaints of dizziness and weakness.  (*Id.* at 290.)  He stated that he was not taking his Plavix due to gastrointestinal side effects, but that he was taking aspirin at a dose of 325 mg.  (*Id.*)  Plaintiff was also taking Zocor, Viagra, Cozaar, and Protonix.  (*Id.*)  Dr. Byrns suspected that plaintiff's symptoms might be due to low blood pressure.  (*Id.*)  Dr. Byrns instructed plaintiff to discontinue Cozaar for two weeks, at which time he would be re-evaluated.  (*Id.*)

In a follow-up visit on April 18, 2006, plaintiff complained of episodes of right upper quadrant pain radiating to his back.  (*Id.*)  Dr. Byrns noted minimal tenderness in the

right quadrant, (*id.*), but an abdominal ultrasound performed on April 26, 2006 revealed unremarkable results, (*id.* at 284).

A routine check-up by Dr. Byrns on December 11, 2006 was unremarkable. (*Id.* at 291.) Dr. Byrns instructed plaintiff to continue with his medications, including taking Plavix on a daily basis, and to follow-up with his cardiologist. (*Id.*)

On March 2, 2007, plaintiff saw Dr. Byrns on an emergency basis, reporting that he was not feeling well and experiencing problems with forgetfulness. (*Id.*) Plaintiff stated that he had "for the most part retired from his job because of his feelings." (*Id.*) A mini-mental state evaluation ("MMSE") and clock-face drawing test, however, revealed normal cognitive functioning. (*Id.*) Dr. Byrns attributed any dysfunction to depression, noting that plaintiff was "making some difficult decisions in his life at this point." (*Id.*) Dr. Byrns prescribed plaintiff Lexapro and stated that he would re-evaluate plaintiff when he returned from Cyprus in two months.[2] (*Id.*)

Two weeks later, on March 20, 2007, plaintiff again saw Dr. Byrns on an emergency basis for an upper respiratory tract infection. (*Id.* at 292.) During that visit, there was no follow-up regarding depression or mention of it. (*Id.*)

---

[2] Lexapro is used to treat anxiety and major depressive disorder. http://www.drugs.com/lexapro.html (last visited Sept. 27, 2011).

### D. February 15, 2007: Physical Therapy Appointment

On February 15, 2007, plaintiff saw Dr. Mark Mabida, a physical therapist, complaining of intermittent dull aching pain on his cervical spine radiating down his left shoulder and arm, numbness in his left hand, and decreased functional mobility and strength. (*Id.* at 286-88.) Dr. Mabida treated plaintiff with moist heat, electrical stimulation, trigger point and myofacial stretching, therapeutic massage, therapeutic exercise, and neuromuscular reeducation. (*Id.*) Dr. Mabida observed that plaintiff experienced pain with AROM testing and noted that plaintiff's cervical spine exhibited a limited active range of motion as follows: flexion to 15 degrees, extension to 20 degrees, lateral flexion to 15 degrees, and rotation to 30 degrees. (*Id.*) Dr. Mabida further noted that plaintiff's neurological status was intact throughout. (*Id.*) Dr. Mabida identified the following problems that required skilled therapy services: pain that limits function, decreased range of motion, decreased strength, decreased independence with ADLs, and a lack of a home exercise program. (*Id.* at 287.)

### E. September 25, 2007: Consultative Examination

On September 25, 2007, plaintiff was referred by the Division of Disability Determination in the New York State Office of Temporary and Disability Assistance ("Division of Disability Determination") to Dr. David Guttman for a

consultative internal medicine examination. (*See id.* at 191-220.) Dr. Guttman noted that plaintiff's chief complaint was hypertension since 1998 and that he also complained of cardiac disease. (*Id.* at 191.) In addition, plaintiff complained of pressure in his abdomen and chest and neck pain. (*Id.*) Plaintiff's medications were Plavix, Cozaar, Niaspan, Protonix, Zocor, aspirin, and Lexapro. (*Id.*) As an initial matter, Dr. Guttman observed that plaintiff appeared to be in no acute distress, had a normal gait and stance, could squat and "walk on [his] heels and toes without difficulty," needed no help changing for the exam or getting on and off the exam table, used no assistive devices, and was able to rise from his chair without difficulty. (*Id.* at 192.) Dr. Guttman assessed plaintiff's health as "fair" with hypertension, atherosclerotic heart disease post stent replacement, and a history of transient ischemic attack. (*Id.* at 193.)

Dr. Guttman performed a stress test, an internal medicine examination, and a physical examination. (*See id.* at 191-95.) During the stress test, plaintiff exercised to 85 percent of the MVHR for his age. (*Id.* at 195.) Dr. Guttman observed an absence of ischemic changes after seven minutes of exercise and recorded plaintiff's blood pressure as 198/117. (*Id.*) Dr. Guttman also noted that plaintiff's heart had a

"regular rhythm" and lacked an audible murmur, gallop, or rub.
(*Id.* at 192.)

In addition, Dr. Guttman found that plaintiff's
cervical spine and lumbar spine showed full flexion, extension,
and full rotary movement bilaterally. (*Id.* at 193.) Dr.
Guttman further found that plaintiff did not have scoliosis,
kyphosis, or abnormalities in his thoracic spine. (*Id.*)
Additionally, Dr. Guttman recorded that plaintiff had full range
of motion of his shoulders, elbows, forearms, wrists, hips,
knees, and ankles bilaterally. (*Id.*) Dr. Guttman also noted
that plaintiff had "[s]trength 5/5 in upper and lower
extremities, joints [that were] stable and non-tender . . .
[and] no redness, heat, swelling, or effusion." (*Id.*)

### F. October 16, 2007:  Residual Functional Appraisal by Medical Consultant

Dr. P. Seitzman, a medical consultant with the
Division of Disability Determinations, reviewed the medical
record on October 16, 2007. (*Id.* at 221.) Dr. Seitzman opined
that plaintiff could perform medium work, lift 50 pounds
occasionally and 25 pounds frequently, and sit, stand, and/or
walk for six to eight hours per day. (*Id.*) Dr. Seitzman noted
that a treadmill exercise test revealed no ischemic changes and
that plaintiff reached his target heart rate. (*Id.*) Dr.

Seitzman also noted that plaintiff's most recent catheterization showed no obstructions.  (*Id.*)

### G. March 17, 2009 to March 26, 2009: Later Visits with Dr. Byrns and Dr. Byrns's Medical Source Statement

Plaintiff met with Dr. Byrns on March 17, 2009 to renew his medications, which included Plavix, Micardis, Zocor, Lisinopril, and Ecotrin.  (*Id.* at 292.)  Dr. Byrns noted that plaintiff was no longer taking Niaspan and instructed plaintiff to discontinue using Lisinopril, which had been prescribed by a doctor in Cyprus while plaintiff was living there between 2007 and 2009.  (*Id.*)  Dr. Byrns further noted that plaintiff was going through a divorce, was running out of medications, and had lost his insurance.  (*Id.*)  Although plaintiff had gained ten pounds since his last visit in March 2007, he had no complaints of chest pain or shortness of breath and his heart sounds were regular with a 2/6 systolic ejection murmur.  (*Id.*)

Plaintiff saw Dr. Byrns again on May 18, 2009 with complaints of pain in his neck, jaw, and back.  (*Id.* at 307; *see also* ECF No. 11, Memorandum of Law In Support Of the Defendant's Motion for Judgment on the Pleadings, dated 9/15/2010 ("Def. Mem.") at 9.)  Plaintiff asked Dr. Byrns to fill out "disability papers."  (Tr. at 307.)  In his progress notes, Dr. Byrns diagnosed plaintiff with a history of coronary artery disease, hypertension, hyperlipidemia, erectile dysfunction, and

depression. (*Id.*) Dr. Byrns prescribed plaintiff aspirin, Plavix, Mycardis, and Lisinopril. (*Id.*) Although Dr. Byrns noted that plaintiff did not present with suicidal ideations, he called plaintiff's daughter and advised her that plaintiff should be evaluated for depression. (*Id.*)

Dr. Byrns completed a Medical Source Statement at the request of plaintiff's attorney on May 26, 2009. (*Id.* at 302-05, 313-16.) Dr. Byrns stated that plaintiff could sit continuously for two hours before needing to stand or walk about for one hour. (*Id.* at 302.) In addition, Dr. Byrns stated that plaintiff could sit for up to two hours out of an eight-hour workday. (*Id.*) Dr. Byrns recorded that plaintiff could lift/carry only ten pounds occasionally, and would need to rest four hours a day. (*Id.* at 304.) Dr. Byrns marked on the statement that plaintiff could rarely or never flex his neck and could occasionally rotate his neck. (*Id.*) Dr. Byrns further stated that plaintiff's condition had existed with these restrictions since August 16, 2006. (*Id.*) However, Dr. Byrns left blank the space in his report for recording which diagnostic techniques were used and the clinical basis for his findings. (*Id.* at 304-05.)

**H. May 23, 2009: Dr. Bamji's Psychological Evaluation**

On May 23, 2009, plaintiff met with Dr. Dinshaw Bamji, a psychiatrist, for a psychological evaluation after being

13

referred by Dr. Byrns.  (*See id.* at 308-11.)  Plaintiff reported feeling depressed, "like a boat in the middle of the ocean – buffeted by waves in all directions," and reported a two and a half year history of panic attacks, agoraphobia, claustrophobia, and fear of having a heart attack.  (*Id.* at 308-09.)  Plaintiff also told the doctor that he was having financial problems due to his first wife's medical expenses and that he was in the process of divorcing his second wife, with whom he had had "two years of misery."  (*Id.* at 308.)  Dr. Bamji noted that plaintiff had no formal thought or language disorders, delusions, suicidal ideas, or homicidal ideas and found plaintiff's global assessment of functioning (GAF) to be 50, which the doctor noted was "fair."[3]  (*Id.* at 310; *see also* ECF No. 11, Def. Mem. at 10.)  Nevertheless, the doctor diagnosed plaintiff with major depressive disorder, panic disorder, and mild agoraphobia, noting severe psychosocial stressors, including "marital/divorce issues" and financial difficulties.  (Tr. at 310.)  He opined that plaintiff suffered from prolonged repeated anxiety attacks, was acutely depressed, and was unable to be gainfully employed.  (*Id.* at 311.)  Dr. Bamji recommended a treatment plan that included Lexapro and individualized psychotherapy.  (*Id.*)  He

---

[3] A GAF of between 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. 2000).

noted that plaintiff's "care should be re-evaluated in 12 months." (*Id.*)

## III. Procedural History

On May 17, 2007, plaintiff applied for SSD benefits under the Act alleging disability beginning August 16, 2006 due to a heart condition and neck and back problems. (*Id.* at 108-11, 127.) The Commissioner denied plaintiff's claim on October 18, 2007. (*Id.* at 62, 66-69.) Plaintiff then requested and obtained a hearing before ALJ Jeffrey M. Jordan ("ALJ"). (*See id.* at 20, 70-71.) The ALJ hearing took place in Jamaica, New York on June 4, 2009, at which time plaintiff testified and was represented by counsel. (*See id.* at 20.)

### A. June 4, 2009 ALJ Hearing

At the ALJ hearing on June 4, 2009, plaintiff testified that he stopped working in 2006 because he began to experience choking sensations and be afraid while he was working on rooftops. (*Id.* at 28.) He stated that he began experiencing panic attacks and feeling shortness of breath after his first wife's death in 2001. (*Id.* at 32.) He stated that after she died, his "business went bad" and "that's [when] it started . . . after that I start[ed] having all these complications." (*Id.*) In addition, plaintiff testified that he had pains in his knees, back, and neck that made it uncomfortable to sit on a straight chair for a long time and had gotten worse over time. (*Id.* at

30, 34.)  As to his heart condition, plaintiff stated that he tires easily and sometimes his heart races, making it difficult for him to sleep.  (*Id.* at 29.)  With respect to his functional capabilities, plaintiff stated that he could sit for no longer than two hours in a regular chair because of his neck, right knee, and lower back pain, and that he could stand for up to two hours at a time.  (*Id.* at 30, 33.)  Plaintiff reported that he feels exhausted and out of breath after walking for two blocks, spends four hours a day resting, and needs to spend twelve hours a day sleeping.  (*Id.* at 34-35.)  Plaintiff further reported that he could not continue his prior work because he could no longer lift heavy weights, could not climb, feared falling from the roof, and was forgetful.  (*Id.* at 37.)

Dr. Gerald Galst, a cardiologist, also testified at the June 4, 2009 hearing as a medical expert after reviewing plaintiff's medical records.  (*See id.* at 42-45.)  Dr. Galst concluded that the evidence showed that plaintiff's cardiac vessels were "patent without any significant obstructive disease."  (*Id.* at 42-43.)  In addition, Dr. Galst observed that plaintiff's electrocardiograms and stress tests revealed consistently normal results, and that plaintiff's cardiac function was also normal.  (*Id.* at 43.)  Regarding plaintiff's allegations of spinal problems, Dr. Galst stated that although there were "some notes from a physical therapist," there were no

16

x-rays, no detailed findings, and no notations from Dr. Byrns
suggesting that plaintiff had any orthopedic and/or
musculoskeletal complaints. (*Id.* at 43-44.) Dr. Galst
concluded that plaintiff's cardiac and orthopedic conditions did
not meet or equal any of the Listings in the regulations. (*Id.*
at 45.) He opined that the only functional limitations
plaintiff might have, based on plaintiff's testimony at the
hearing, would be psychological. (*Id.*)

Donald Silve, a vocational expert, also testified at
the June 4, 2009 hearing. (*See id.* at 47-52.) Mr. Silve stated
that plaintiff's past work as a heating and air conditioner
installer-servicer is exertionally medium work. (*Id.* at 47.)
*See* U.S. Dep't of Labor, Dictionary of Occupational Titles
("DOT") No. 637.261-014, *available at*
http://www.oalj.dol.gov/public/dot/references/dot06c.htm (last
visited Sept. 27, 2011). Mr. Silve also testified that
plaintiff's prior work experience equipped plaintiff with
transferable skills, such as the ability to compare and compile
information regarding the function, structure, composites, and
amounts of material needed for a job. (Tr. at 48-49.) The ALJ
asked Mr. Silve to consider a hypothetical individual of
plaintiff's age, educational background, and past work
experience who could lift/carry 50 pounds occasionally and 25
pounds frequently, and who could sit/stand and walk about for

17

six hours out of an eight hour workday.  (*Id.* at 48.)  The ALJ
also stated that this hypothetical individual would need to
avoid climbing ropes and performing other postural movements
frequently, but that he had no fine or gross manipulation
limitations.  (*Id.*)  Mr. Silve opined that without the
limitations with respect to climbing, the individual would be
able to plaintiff's prior work.  (*Id.*)

Mr. Silve also opined that the same hypothetical
individual, with the additional limitation that he could only
perform simple, routine, low-stress work, would be unable to
perform plaintiff's past work, but could perform other medium
work existing in significant numbers in the national economy.
(*Id.* at 48-49.)  Mr. Silve cited machine feeder, DOT No.
699.686-010, machine finisher, DOT No. 690.685-170, and hand
packager, DOT No. 920.587-018, as examples of other work such an
individual could perform.  (*Id.* at 49-50.)  Mr. Silve also
testified that, at that time, there were 32,520 machine feeder
jobs nationally and 2,148 regionally; 8,520 machine finisher
jobs nationally and 459 regionally; and 32,170 hand packager
jobs nationally and 2,369 regionally.  (*Id.*)

At the conclusion of the aforementioned testimony, the
ALJ stated that he believed that "the records have not been
fully developed" with respect to plaintiff's complaints of neck
and back pain and his psychological impairments.  (*Id.* at 54.)

The ALJ concluded that he did not have "sufficient evidence to form an opinion" and stated that he planned to refer plaintiff for two consultative examinations by doctors to determine the extent of his musculoskeletal and psychological impairments. (*Id.* at 53-54.)  The ALJ informed plaintiff that if he could not attend the examinations, plaintiff should notify "the people . . . who send [the examination] information to [him] to explain the reason why [he] can't attend."  (*Id.* at 54.)

On June 13, 2009, the Social Security Administration ("SSA") sent plaintiff appointment letters informing him that consultative examinations had been scheduled for June 18 and June 20, 2009.  (*See id.* at 328-29.)  On June 18, 2009, plaintiff's counsel called the SSA requesting to reschedule the examinations because plaintiff was in Cyprus.  (*Id.* at 163.)  The SSA cancelled the scheduled examinations and instructed plaintiff's counsel to inform the Bronx Office of Disability Adjudication and Review ("ODAR") when plaintiff became available.  (*Id.*)  On October 6, 2009, an SSA employee called the office of plaintiff's counsel and told them to inform plaintiff that he was required to return by November 2009 and that the "[ODAR] is inquiring."  (*Id.* at 164.)  On October 16, 2009, plaintiff's attorney wrote to the SSA requesting a further postponement of the examinations.  (*Id.* at 165.)  The letter requested that the ALJ wait to make a decision in the case,

explaining that plaintiff was still in Cyprus attending to "private matters" but that he would return "soon." (*Id.*) Nothing in the record indicates whether the ALJ or the SSA responded to the October 16, 2009 letter.

### B. The ALJ's Decision

On October 23, 2009, the ALJ issued a decision denying plaintiff's claims after *de novo* review pursuant to the five-step sequential analysis for determining whether an individual is disabled under the Act. (*Id.* at 8.) In his decision, the ALJ noted that although "every reasonable effort was made to develop the medical history of this claimant," the ALJ was "unable to obtain" additional evidence from consultative examinations because "the claimant returned to Cyprus after the hearing and did not come back to the United States in September 2009 to attend the examinations as promised." (*Id.*)

According to the ALJ, under step one, plaintiff had not engaged in substantial gainful activity since August 16, 2006. (*Id.* at 9.) Under step two, the ALJ found that plaintiff's only severe impairments were coronary artery disease and hypertension. (*Id.*) The ALJ noted that although the record contained some evidence of a spinal disorder, pleural plaque thickening in plaintiff's chest cavity, diverticulosis, depression, and anxiety, these impairments were not severe because they did not "significantly limit [plaintiff's] ability

to perform basic work activities." (*Id.* at 10.)  With respect to plaintiff's spinal problems, the ALJ explained that there was "no diagnostic imaging demonstrating specific pathology" and that, while the plaintiff's treating physician, Dr. Byrns, purportedly referred plaintiff to physical therapy, Dr. Byrns's "scant records make absolutely no mention of this condition." (*Id.*)  Regarding plaintiff's pleural plaque thickening condition, the ALJ explained that while a 2004 CT scan demonstrated multiple plaque thickening in plaintiff's chest, plaintiff "made no allegation of any symptoms" related to such a condition.  (*Id.*)  Additionally, the ALJ found that there was "next to no medical evidence with reference to the [plaintiff's] depression and anxiety."  (*Id.*)  The ALJ noted that while Dr. Byrns had prescribed an anti-depressant in March 2007, there was no mention of this medication in Dr. Byrns's notes from plaintiff's May 18, 2009 visit when his medications were discussed.  (*Id.*)  Further, although Dr. Bamji's report reflected a two and a half year history of panic attacks, agoraphobia and claustrophobia, plaintiff had not received treatment for these conditions, and other than a "depressed mood," plaintiff's mental status examination was normal.  (*Id.*)

Under step three, the ALJ found that plaintiff's impairments or combination of impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part

404, Subpart P, Appendix 1. (*Id.* at 11.) The ALJ then found under step four that plaintiff had the residual functional capacity ("RFC") to perform his past relevant work as a heating and air conditioning installer-servicer and the full range of medium work as defined in 20 C.F.R. § 404.1567(c). (*Id.* at 12, 17-18.)

In particular, the ALJ noted that he placed significant weight on Dr. Galst's opinion that the only functional limitations that plaintiff might have, based on plaintiff's testimony and a review of plaintiff's medical records, would be psychological. (*Id.* at 17, 45.) In addition, the ALJ considered but assigned little weight to plaintiff's subjective testimony regarding his pain and functional limitations and to Dr. Byrns's Medical Source Statement. (*Id.* at 16-17.) The ALJ also stated that Dr. Seitzman's opinion "did not form the basis of this decision" even though he determined that Dr. Seitzman's opinion was supported by the medical evidence and consistent with the claimant's residual functional capacity. (*Id.* at 17.) In light of the record evidence, the ALJ concluded that plaintiff "can sit for six hours, stand/walk for six hours, lift/carry and push/pull fifty pounds occasionally and twenty-five pounds frequently, and has no restrictions in climbing ropes, ladders, and scaffolding or using his hands for fine and gross dexterous activities." (*Id.*)

Under step five, the ALJ found, upon considering plaintiff's age, education, work experience, and residual functional capacity, that plaintiff was not disabled and would be able to perform medium work involving low stress jobs that did not require climbing of ladders, ropes and scaffolding. (*Id.* at 18-19.)  The ALJ noted that plaintiff could perform the occupations of machine feeder, machine finisher, and hand-packer.  (*Id.* at 19.)

**C. Plaintiff's Request for Further Review**

On February 26, 2010, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review.  (*Id.* at 1-3.) Proceeding with new counsel, plaintiff filed the instant action on March 17, 2010, alleging that he is entitled to receive SSD benefits due to "a combination of medical, orthopedic, and psychiatric impairments."  (Compl. ¶ 5.)  In his Complaint, plaintiff alleged that the ALJ's decision was "erroneous" and "contrary to law."  (*Id.* ¶¶ 10-11.)

On September 15, 2010, defendant served plaintiff with a copy of its motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (*See* ECF No. 8, Letter to Plaintiff's Counsel, dated 9/15/2010; *see also* ECF No. 10, Notice of Motion for Judgment on the Pleadings, dated 9/15/2010; ECF No. 11, Def. Mem.)  On October 15, 2010, plaintiff served

23

defendant with a cross-motion for judgment on the pleadings. (*See* ECF No. 12, Notice of Cross-Motion for Judgment on the Pleadings; ECF No. 13, Memorandum of Law In Opposition To Defendant's Motion for Judgment on the Pleadings, and In Support of Plaintiff's Cross-Motion for Judgment on the Pleadings, dated 10/15/2010 ("Pl. Mem.").)  Defendant opposed plaintiff's motion on October 29, 2010.  (*See* ECF No. 14, Memorandum of Law In Further Support Of Defendant's Motion for Judgment on the Pleadings and In Opposition To Plaintiff's Cross-Motion for Judgment on the Pleadings dated 10/29/2010 ("Def. Reply").)  The fully-briefed motions were filed with this court on November 30, 2010.  (*See* ECF No. 16, Letter to the Honorable Kiyo A. Matsumoto, dated 11/30/2010.)

Plaintiff presently alleges that the ALJ erred by (1) failing to re-contact plaintiff's treating and consulting physicians where the ALJ admitted that the record was inadequate with regard to plaintiff's psychological and orthopedic impairments; (2) failing to afford plaintiff an opportunity to reschedule or provide good cause for canceling his consultative examinations; (3) failing to give sufficient weight to the medical opinion of plaintiff's treating physician; (4) failing adequately to assess plaintiff's credibility; (5) failing to set forth an adequate function-by-function analysis of plaintiff's residual functional capacity; and (6) improperly relying on a

non-treating medical expert's assessment of plaintiff's residual

functional capacity.  (*See generally* ECF No. 13, Pl. Mem.)[4]

### LEGAL STANDARDS

**I.   Standard of Review**

   **A. Legal Standards Governing Agency Determinations of
       Eligibility to Receive Benefits**

       Pursuant to the Social Security Act, a claimant is

disabled if he is unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The impairment must be of "such severity that [the claimant] is

not only unable to do his previous work, but cannot, considering

his age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national

economy . . . ."  *Id.* at § 423(d)(2)(A).

       In evaluating whether a claimant is disabled, the SSA

requires the ALJ to conduct a five-step sequential analysis

finding each of the following: (1) that the claimant is not

---

[4] The court notes that plaintiff's counsel, Herbert S. Forsmith, has routinely
submitted stream-of-consciousness, incomprehensible filings in this court.
*See, e.g., Grosse v. Comm'r of Soc. Sec.*, No. 08-CV-4137, 2011 WL 128565, at
*2 (E.D.N.Y. Jan. 14, 2011).  This case is no different.  Mr. Forsmith's 21-
page brief contains little organization and primarily cites case law from
other Circuits.  Once again, Mr. Forsmith is advised to make discrete,
sensible arguments in his future moving papers.  In the instant case, the
court will address Mr. Forsmith's arguments as best it can comprehend them.

working; (2) that the claimant has a medically determinable impairment or a combination of impairments that is "severe;" (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability; (4) that the claimant is not capable of continuing in his prior type of work; and (5) there is no other type of work that the claimant can do. *Burgess v. Astrue,* 537 F.3d 117, 120 (2d Cir. 2008); *see* 20 C.F.R. § 404.1520(a)(4). An impairment or combination of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(c).

During this five-step analysis, the Commissioner must "'consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity' to establish eligibility for Social Security benefits." *Burgin v. Astrue,* 348 F. App'x 646, 647 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1523). In cases where "the disability claim is premised upon one or more listed impairments . . . the [Commissioner] should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment." *Berry v. Schweiker,* 675 F.2d 464, 469 (2d Cir. 1982).

In steps one through four of the five-step evaluation process, the claimant bears the general burden of proving

26

disability.  *Burgess,* 537 F.3d at 128.  In step five, the burden
shifts from the claimant to the Commissioner, requiring the
Commissioner to show that in light of plaintiff's residual
functional capacity, age, education, and work experience,
plaintiff is "able to engage in gainful employment within the
national economy."  *Sobolewski v. Apfel,* 985 F. Supp. 300, 310
(E.D.N.Y. 1997).

### B. The Substantial Evidence Standard for Federal Court Review of Agency Determination

A district court reviews the Commissioner's decision
to "determine whether the correct legal standards were applied
and whether substantial evidence supports the decision."  *Butts
v. Barnhart,* 388 F.3d 377, 384 (2d Cir. 2004) (citing *Machadio
v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002)).  "Substantial
evidence is 'more than a mere scintilla.  It means such relevant
evidence as a reasonable mind might accept as adequate to
support a conclusion.'"  *Halloran v. Barnhart*, 362 F.3d 28, 31
(2d Cir. 2004) (quoting *Richardson v. Perales,* 402 U.S. 389, 401
(1971)).

After reviewing the Commissioner's determination, the
district court may "enter, upon the pleadings and transcript of
the record, a judgment affirming, modifying, or reversing the
decision of the Commissioner of Social Security, with or without
remanding the cause for a rehearing."  *Butts*, 388 F.3d at 384

(quoting 42 U.S.C. § 405(g)).  "Remand is 'appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim.'" *Lackner v. Astrue*, No. 09-CV-895, 2011 WL 2470496, at *7 (N.D.N.Y. May 26, 2011) (quoting *Kirkland v. Astrue*, No. 06-CV-4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008)).

## DISCUSSION

### I.   The ALJ Failed to Fully Develop the Administrative Record.

Plaintiff argues that the ALJ erred by (1) failing to re-contact plaintiff's treating physician and other medical sources to obtain additional information concerning plaintiff's orthopedic and psychological impairments, (ECF No. 13, Pl. Mem. at 12-13); (2) failing to re-contact plaintiff's treating physician to determine the diagnostic basis for his Medical Source Statement, (*id.* at 10-11, 13); and (3) failing to inquire whether plaintiff had good cause for not attending his scheduled consultative examinations, (*id.* at 7-9).  The court agrees and remands accordingly.

**A. The ALJ Erred by Failing to Re-Contact Plaintiff's Treating Physician, Psychologist, and Other Medical Sources Concerning Plaintiff's Alleged Orthopedic and Psychological Impairments.**

At the conclusion of the June 4, 2009 hearing, the ALJ acknowledged that the record was incomplete and required further development.  Specifically, the ALJ stated:

> I don't have sufficient evidence to . . . make a decision in this case. . . .  I don't have sufficient evidence to form an opinion. . . . [T]he recent evidence in the case that you have additional impairments that have not been fully developed.  So what I'm going to do is refer you for some consultative examinations by doctors, an orthopedist and a psychiatrist or psychologist.

(Tr. at 52-53.)  Despite this statement, without gathering additional information from any sources, on October 23, 2009 the ALJ issued a decision finding that plaintiff was not disabled. In particular, the ALJ concluded, "[a]lthough the record contains some indication that the claimant has spinal disorder, pleural plaque thickening, diverticulosis, depression and anxiety, the undersigned finds that these impairments do not significantly limit the claimant's ability to perform basic work activities."  (*Id.* at 10.)  With respect to plaintiff's alleged orthopedic impairments, the ALJ stated that although Dr. Byrns referred plaintiff to a physical therapist, Dr. Byrns's "scant records" do not mention any spinal condition.  (*Id.*)  In addition, the ALJ noted that "the only record in evidence" regarding plaintiff's spinal impairment was the single report

from Dr. Mabida, which contains "no diagnostic imaging
demonstrating specific pathology." (*Id.* at 10, 14.)  With
respect to plaintiff's alleged psychological impairment, the
decision stated, "there is next to no medical evidence with
reference to the claimant's depression and anxiety." (*Id.* at
10.)  The ALJ acknowledged that Dr. Byrns noted plaintiff's
memory problems, prescribed him Lexapro, and later referred
plaintiff to a psychiatrist, Dr. Bamji, but concluded that such
"scant evidence" was insufficient to establish a severe
impairment. (*Id.* at 14-15.)

　　　　Generally, an ALJ has an affirmative duty to develop
the administrative record. *Anderson v. Astrue*, No. 07-CV-4969,
2009 WL 2824584, at *12 (E.D.N.Y. Aug. 28, 2009) (quoting *Tejada
v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999)).  This is true
regardless of whether a claimant is represented by counsel.
*Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999).  Pursuant to
20 C.F.R. § 404.1512(e), when the evidence received from a
claimant's treating physician, psychologist, or other medical
source is "inadequate . . . to determine whether [the claimant]
is disabled," the ALJ has an obligation to seek additional
information to supplement the record.  *See Mantovani v. Astrue*,
No. 09-CV-3957, 2011 WL 1304148, at *3 (E.D.N.Y. Mar. 31, 2011)
(holding that ALJ should have requested "additional evidence or
clarification" from treating physician where physician's opinion

was not supported by "objective diagnostic tests or clinical
signs"). Although the duty does not arise where there are no
obvious gaps in the administrative record, *Rosa*, 168 F.3d at 79
n.5, or where the medical record is simply inconsistent with a
treating physician's opinion, *Rebull v. Massanari*, 240 F. Supp.
2d 265, 273 (S.D.N.Y. 2002), the ALJ must seek additional
evidence or clarification when a report from a medical source
contains a conflict or ambiguity, lacks necessary information,
or is not based on medically acceptable clinical and laboratory
diagnostic techniques.  20 C.F.R. § 404.1512(e)(1).  The
regulations provide that the first step in developing an
inadequate record is to "recontact [the claimant's] treating
physician[5] or psychologist or other medical source[6] to determine

---

[5] A "treating source" is defined by the regulations as a "physician,
psychologist, or other acceptable medical source who provides [the claimant],
or has provided [the claimant], with medical treatment or evaluation and who
has, or has had, an ongoing treatment relationship with [the claimant]."  20
C.F.R. § 404.1502; *see also Callanan v. Astrue*, No. 10-CV-1717, 2011 589906,
at *3 (E.D.N.Y. Feb. 10, 2011).  Dr. Byrns was plaintiff's primary care
physician during the relevant time period and thus qualifies as a treating
physician.

[6] "The term 'medical sources' refers to both 'acceptable medical sources' and
other health care providers who are not 'acceptable medical sources.'"  Soc.
Sec. Ruling 06-03p, 2006 WL 2329939, at *1 (Aug. 9, 2006) (citing 20 C.F.R.
§ 404.1502).  Acceptable medical sources include licensed physicians,
psychologists, optometrists, podiatrists, and speech language pathologists.
*Id.*; 20 C.F.R. § 404.1513(a).  Although the record indicates that Dr. Bamji
only saw plaintiff on one occasion and is therefore not a "treating source,"
as a psychiatrist, he is considered an acceptable medical source.  *See* 20
C.F.R. § 404.1513(a)(2).  Although a physical therapist such as Dr. Mabida is
not an "acceptable medical source," *Carway v. Astrue*, No. 06-CV-13090, 2011
WL 924215, at *3 (S.D.N.Y. Mar. 16, 2011), a physical therapist is an "other
source" from whom an ALJ has a duty to seek additional information when the
record is incomplete.  *See* 20 C.F.R. § 404.1513(d)(1) ("Other sources
include, but are not limited to -- (1) Medical sources not listed in
paragraph (a) of this section (for example, nurse-practitioners, physicians'

whether the additional information [the ALJ] need[s] is readily available." *Id.* § 404.1512(e)(1).

Here, the ALJ expressly concluded that he lacked sufficient evidence concerning plaintiff's orthopedic and psychological impairments to decide whether plaintiff was disabled.  Nevertheless, contrary to his duty under the regulations to develop the record, the ALJ did not re-contact Dr. Mabida, Dr. Byrns, or Dr. Bamji to obtain additional information concerning these alleged impairments.  His failure to do so was error.  *See, e.g.*, *Calzada v. Astrue*, 753 F. Supp. 2d 250, 264 n.35, 275 (S.D.N.Y. 2010) (remanding because the ALJ failed to "address a clear gap in the record regarding plaintiff's mental status" where the ALJ noted a "lack of any medical records or clinical findings evidencing plaintiff's alleged depression" despite physicians' notes indicating plaintiff was taking prescription depression medications and plaintiff's claims of depression).

Contrary to defendant's assertions, this is not a scenario where the record was complete and the doctors' reports were "contradicted by substantial evidence" in the

---

assistants, naturopaths, chiropractors, audiologists, and therapists)"). While the regulations provide that other sources may provide evidence of the severity of a claimant's impairment or how a claimant's impairment affects his ability to work, only an acceptable medical source such as a medical doctor may establish whether a claimant has a medically determinable impairment.  20 C.F.R. § 404.1513(a), (d); *Coscia v. Astrue*, 2010 WL 3924691, at *8 (E.D.N.Y. Sept. 29, 2010).

administrative record.  (*See* ECF No. 11, Def. Mem. at 19.)  The
ALJ did not identify any evidence in the record to contradict
plaintiff's claims of orthopedic and psychological impairments.
Indeed, the only arguably contrary evidence the ALJ mentioned
was that plaintiff had received no psychiatric treatment and
that his mental status examination was normal.  (Tr. at 10.)
This lack of evidence, however, is not a sufficient basis on
which to conclude that plaintiff is not disabled.  *See Rosado v.
Barnhart*, 290 F. Supp. 2d 431, 440 (S.D.N.Y. 2003) ("The ALJ
cannot rely on the *absence* of evidence, and is thus under an
affirmative duty to fill any gaps in the record.").

       Further, there is no evidence to suggest the ALJ knew
from past experience that Dr. Byrns, Dr. Mabida, or Dr. Bamji
either could not or would not provide the information needed.
*See* 404 C.F.R. § 1512(e)(2) ("We may not seek additional
evidence or clarification from a medical source when we know
from past experience that the source either cannot or will not
provide the necessary findings.").  *Cf. Blanda v. Astrue*, No.
05-CV-5723, 2008 WL 2371419, at *10 (E.D.N.Y. June 9, 2008)
(excusing ALJ's failure to obtain additional information from
plaintiff's treating physicians where two of the doctors did not
respond to requests for information and the third doctor
provided "*three* conclusory statements in response
to *three* separate requests for information").  Indeed, in light

of the fact that plaintiff's last appointments with Drs. Bamji and Byrns were less than two weeks before the hearing and only five months before the ALJ rendered his decision, it is likely that the information the ALJ needed concerning plaintiff's alleged impairments would have been readily available.

Accordingly, the ALJ's failure to re-contact Drs. Mabida, Byrns, and Bamji to obtain additional information concerning plaintiff's alleged orthopedic and psychological impairments requires remand. *See Calzada*, 753 F. Supp. 2d at 275 (remanding case for further development of record regarding mental impairment).

### B. The ALJ Erred by Failing to Re-Contact Dr. Byrns Concerning the Medical Source Statement.

Plaintiff further asserts that the ALJ had a duty to re-contact plaintiff's treating physician, Dr. Byrns, to seek additional information concerning the clinical and diagnostic basis for his Medical Source Statement. (*See* ECF No. 13, Pl. Mem. at 10, 12-13.)  Because the ALJ found that Dr. Byrns's Medical Source Statement did not indicate the basis for his opinion, but did not re-contact Dr. Byrns to ascertain the basis for his opinion, remand is required.

Where a report received from a medical source "does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques, an ALJ has an obligation to

re-contact the physician to seek additional evidence or
clarification.  20 C.F.R. § 404.1512(e)(1).  *See Schaal v.
Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical
findings were inadequate, it was the ALJ's duty to seek
additional information from [the treating physician] *sua
sponte*."); *Taylor v. Astrue*, No. 07-CV-3469, 2008 WL 2437770, at
*3 (E.D.N.Y. June 17, 2008) (where the ALJ found that the
treating physician's opinion was not supported by objective
clinical findings, the ALJ should have "attempt[ed] to elicit
further supporting information directly from [the treating
physician] before choosing not to assign controlling weight to
[the physician's] opinion"); *Mortise v. Astrue*, 713 F. Supp. 2d
111, 123 (N.D.N.Y. 2010) (where the ALJ afforded little weight
to physician's opinion because he found it was not based on
clinical and diagnostic techniques, the ALJ "had an obligation
to re-contact [the physician] to assess on what those opinions
were based").  "The duty of the ALJ to develop the record is
particularly important when it comes to obtaining information
from a claimant's treating physician." *Devora v. Barnhart*, 205
F. Supp. 2d 164, 172-73 (S.D.N.Y. 2002).  *See also Rosa*, 168
F.3d at 79-80 (stating that the ALJ may not rely on sparse notes
or conclusory assessments from a treating physician).

Plaintiff saw Dr. Byrns on May 18, 2009 complaining of
neck, jaw, and back pains, and asked Dr. Byrns to fill out

"disability papers." (Tr. at 307.)  On May 26, 2009, Dr. Byrns completed a Medical Source Statement indicating that, *inter alia* (1) plaintiff could sit continuously for two hours before needing to stand or walk about for one hour; (2) plaintiff could sit for up to two hours out of an eight-hour work day; (3) plaintiff could stand or walk about for 30 minutes before needing to recline or lie down for 30 minutes; (4) plaintiff could stand or walk around for up to two hours out of an eight-hour work day; (5) plaintiff would need to rest for four hours out of an eight-hour work day; (6) plaintiff could lift/carry only ten pounds occasionally; and (7) plaintiff could rarely or never flex his neck and could occasionally rotate his neck. (*Id.* at 302-04.)  In addition, Dr. Byrns noted that plaintiff's condition had existed with these restrictions since August 16, 2006.  (*Id.* at 304.)  Dr. Byrns, however, did not document any clinical findings and left blank the space in his report for recording the diagnostic basis for his assessment.  (*Id.* at 304-05.)

In his decision, the ALJ determined that Dr. Byrns's Medical Source Statement was entitled to little weight because it was "not well supported by or consistent with the record as a whole."  (*Id.* at 17.)  In addition, the ALJ noted that "Dr. Byrns provided no justification, by way of diagnostic test

36

results or findings on examination, for the extreme degree of limitation he noted." (*Id.*)

Defendant argues that the ALJ was not required to re-contact Dr. Byrns because "in addition to Dr. [Byrns's] assessment, the record contains [Dr. Byrns's] notes detailing plaintiff's complaints, clinical findings, and treatment" and therefore the record was fully developed with no obvious gaps. (ECF No. 14, Def. Reply at 4.)  Although the record does contain Dr. Byrns's "progress notes," which summarize plaintiff's complaints, list his medications, record his vital signs, and note any recommended treatment, (Tr. at 290-92, 307), these notes do not mention any clinical findings or diagnostic techniques that Dr. Byrns used to assess plaintiff's ability to sit, stand, or walk, carry items, or rotate his neck. *Cf.* *Mortise*, 713 F. Supp. 2d at 122-23 (noting that "objective medical evidence" of plaintiff's impairments included a diminished knee/ankle jerk, tenderness upon palpation of the lumbar spine, and decreased sensation in both lower extremities, and the doctor's clinical diagnostic techniques included having plaintiff ascend and descend stairs, and complete a push test).

Further, although the ALJ stated that Dr. Byrns's Medical Source Statement was not "consistent with the record as a whole," the ALJ did not identify, and the court cannot locate, any other medical opinions in the record that address the issues

37

contained in Dr. Byrns's Medical Source Statement. *Cf. Gonzalez v. Chater*, No. 96-CV-6250, 1998 WL 398809, at *1 (2d Cir. June 8, 1998) (finding that ALJ did not have to re-contact treating physician where he "did not discredit the opinions of [plaintiff's] treating physicians solely because they were not based on clinical findings but rather gave them 'little weight' on this basis combined with the finding that these treating physicians' opinions were inconsistent with several other medical opinions in the record"); *Robertson v. Astrue*, No. 09-CV-0501, 2011 WL 578753, at *5 (W.D.N.Y. Feb. 9, 2011) (where "the record was fully developed and contained comprehensive reports from all three doctors," no additional evidence was needed for the ALJ to determine whether the plaintiff was disabled, and it was within the ALJ's discretion to reject the physician's estimates of the plaintiff's residual functional capacity).

Thus, the ALJ erred by failing to re-contact Dr. Byrns to determine whether his report was based on "medically acceptable clinical and laboratory diagnostic techniques" before choosing not to assign controlling weight to his opinion. Accordingly, remand is appropriate.[7]

---

[7] Plaintiff further argues that the ALJ erred in not assigning controlling weight to Dr. Byrns's opinion. (*See* ECF No. 13, Pl. Mem. at 10.) On remand, the ALJ shall reassess the weight assigned to Dr. Byrns's opinion in light of any new evidence the ALJ receives after re-contacting the doctor.

### C. The ALJ Erred by Denying Plaintiff an Opportunity to Attend or Reschedule the Consultative Examinations.

Plaintiff alleges that the ALJ erred by issuing a decision without giving plaintiff an opportunity to reschedule his consultative examinations or give good reasons for failing to attend them at the originally scheduled time.  (ECF No. 13, Pl. Mem. at 6-9.)  The court agrees.

Pursuant to the regulations, if necessary additional information is not readily available from a claimant's physicians or other medical sources, the ALJ "will ask [the claimant] to attend one or more consultative examinations at [the SSA's] expense."  20 C.F.R. § 404.1512(f).  *See also Sarago v. Shalala*, 884 F. Supp. 100, 106 (W.D.N.Y. 1995).  Nevertheless, "when despite efforts to obtain additional evidence the evidence is not complete, [the ALJ] will make a determination or decision based on the evidence [he has]."  20 C.F.R § 404.1527(c)(4).  Accordingly, if a claimant fails or refuses to take part in a scheduled consultative examination and has no good reason for the failure or refusal, a finding of not disabled may be rendered.  *Id.* § 404.1518(a).  *See also Kratochvil v. Comm'r of Soc. Sec.*, No. 06-CV-1535, 2009 WL 1405226, at *4-5 (N.D.N.Y. May 18, 2009) (where plaintiff's proffered "good reasons" for failing to attend either of two

scheduled consultative examinations were contradicted by the record, plaintiff could not prevail based on a challenge to the adequacy of the record).  The regulations instruct claimants, "if you have any reason why you cannot go for the scheduled appointment, you should tell us about this as soon as possible before the examination date."  20 C.F.R. § 404.1518(a).  Good reasons for failing to appear at a consultative examination include, but are not limited to (1) illness on the date of the scheduled examination; (2) not receiving timely notice of the scheduled examination or receiving no notice; (3) being furnished incorrect or incomplete information, or being given incorrect information about the physician involved or the time or place of the examination; (4) having a death or serious illness in claimant's immediate family; or (5) claimant's treating physician objecting to the examination.  *Id.* § 404.1518(b)-(c).  The regulations also note that an ALJ "will consider [a claimant's] physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if [the claimant has] a good reason for failing to attend a consultative examination."  *Id.* § 404.1518(a).

During the June 4, 2009 hearing, the ALJ acknowledged that he lacked sufficient evidence regarding the severity of plaintiff's orthopedic and psychological impairments to decide

40

whether plaintiff was disabled, and informed plaintiff that he planned to schedule two consultative examinations in order to more fully develop the record. (Tr. at 53-54.) The consultative examinations were subsequently scheduled and appointment letters were sent to plaintiff on June 13, 2009. (*Id.* at 328-29.) On June 18, 2009, plaintiff's counsel notified the SSA that plaintiff could not attend the examinations on the scheduled dates because he was out of the country and would return in September. (*Id.* at 163.) The SSA cancelled the consultative examinations and no further examinations were scheduled. (*See id.* at 163-65.) On October 6, 2009, the SSA contacted plaintiff's counsel's office and stated that plaintiff should contact the SSA as soon as he returns, but in any event no later than November. (*Id.* at 164.) The examinations still were not rescheduled. (*See id.*) On October 16, 2009, plaintiff's counsel sent a letter to the ALJ asking him to postpone making a decision in the case. (*Id.* at 165.) The letter explained that plaintiff was still in Cyprus attending to "private matters" but that he "plan[ned] on returning to New York soon in order to attend his consultative examination appointments." (*Id.*) On October 23, 2009, one week after plaintiff's counsel's October 16 letter, ALJ Jordan issued a decision denying benefits. With respect to the consultative examinations, the decision stated, "the claimant returned to

41

Cyprus after the hearing and did not come back to the United

States in September 2009 to attend the examinations as promised

. . . . As such, the undersigned was unable to obtain this

additional evidence." (*Id.* at 7.)

      The court finds that the ALJ denied plaintiff a

meaningful opportunity to reschedule the consultative

examinations or offer good reasons for his failure to attend the

originally scheduled examinations.  This is not a case where

plaintiff missed scheduled consultative examinations without

explanation.  *See, e.g.*, *Stephens v. Astrue*, No. 6:08-CV-0400,

2009 WL 1813258, at *8 (N.D.N.Y. June 25, 2009) (rejecting

plaintiff's claim that the ALJ failed to develop the record

where plaintiff refused to acknowledge that a consultative

examination was arranged and did not argue that she had a good

reason for her failure or refusal to attend).  To the contrary,

plaintiff's attorney contacted the SSA to cancel the scheduled

appointments because plaintiff was out of the country, and told

the SSA that plaintiff would reschedule the examinations when he

returned to the United States.

      Nor is this a case where plaintiff refused to

cooperate or attend the examinations.  *See, e.g.*, *Cornell v.

Astrue*, 764 F. Supp. 2d 381, 392 (N.D.N.Y. 2010) (finding ALJ

fulfilled his duty to develop the record where consultative

examinations were scheduled, but plaintiff was unwilling to

travel to attend them and declined to do so after being informed
that "her non-compliance with the request would result in a
decision based upon the evidence already in her file"); *Walker
v. Barnhart*, 172 F. App'x 423, 426-28 (3d Cir. 2006) (noting
that plaintiff missed rescheduled consultative examinations and
repeatedly failed to cooperate with the SSA's scheduling
attempts with no indication of better future compliance).
Instead, plaintiff's counsel's October 16 letter specifically
indicated that plaintiff planned to return to New York soon in
order to attend the examinations.  (Tr. at 165.)  Although
plaintiff's failure to return in September as initially expected
suggests a lack of urgency on plaintiff's part to reschedule the
consultative examinations, he was not actually non-compliant.
Indeed, the last notification he received from the SSA
instructed him to return by November, presumably so he could
proceed with the examinations at that time.

Further, the ALJ's decision makes no mention of
whether he found plaintiff lacked good reasons for his failure
to attend the scheduled examinations.[8]  The Commissioner argues

---

[8] Plaintiff also argues that the Hearings, Appeals and Litigation Law Manual
("HALLEX") Regulation I-2-5-32 required the ALJ to obtain a medical expert's
opinion regarding the possible effect of plaintiff's mental impairment on his
failure to undergo the examinations.  (ECF No. 13, Pl. Mem. at 8.)  In this
Circuit, failure to follow HALLEX regulations does not amount to legal error.
*See Grosse*, 2011 WL 128565, at *5.  *But see McClean v. Astrue*, 650 F. Supp.
2d 223, 228 (E.D.N.Y. 2009) (remanding where ALJ failed to set forth an
explanation of how plaintiff's failure to attend a consultative examination
affected the ALJ's final decision and the Commissioner conceded that the
failure to provide such an explanation was legal error).

that the ALJ was justified in issuing a decision on October 23,
2009 without further delay because plaintiff left for Cyprus
despite having been informed that consultative examinations
would be scheduled and failed to provide a definite return date.
(ECF No. 14, Def. Reply at 3-4.)  However, the ALJ did not offer
these or any other reasons in his decision.  In failing to do
so, the ALJ precluded meaningful review of the ALJ's decision to
make a determination based on incomplete evidence.  *See Snell v.
Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) ("A reviewing court 'may
not accept appellate counsel's *post hoc* rationalizations for
agency action.'" (quoting *Burlington Truck Lines, Inc. v. United
States*, 371 U.S. 156, 168 (1962))); *Grosse v. Comm'r of Soc.
Sec.*, No. 08-CV-4137, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14,
2011) (remanding where ALJ's cursory analysis of claimant's
residual functional capacity "does not subject the ALJ's opinion
to meaningful review"); *Fordham v. Astrue*, No. 309-CV-003, 2010
WL 2327633, at *5 (S.D. Ga. May 13, 2010) ("The Court cannot
second-guess what the ALJ may have been thinking or may have
intended to consider when he found that Plaintiff had not
established a good reason for failing to attend the consultative
examination. While the Court is making no determination as to
whether Plaintiff failed to show good cause for not attending
the scheduled consultative examination, the ALJ's decision does
not adequately explain his reasoning or provide the Court with

the means to determine whether the correct legal standards were applied.").

Accordingly, because the ALJ erred by not allowing plaintiff to reschedule the examinations in November, as expected, and by failing to explain in his decision whether plaintiff provided good reasons for his failure to attend the originally scheduled examinations, remand is appropriate.

## II.  Other Challenges to the ALJ's Decision

In addition to the infirmities in the ALJ's decision already discussed, plaintiff presents a number of other challenges.  In particular, plaintiff argues that (1) the ALJ failed to properly evaluate the credibility of plaintiff's testimony about his subjective pain, symptoms, and functional limitations, (ECF No. 13, Pl. Mem. at 13-18); and (2) the ALJ erred in setting forth plaintiff's function-by-function abilities, (*id.* at 5-6).

Because the ALJ did not have a complete and comprehensive medical record before him when he determined that plaintiff was not disabled, it necessarily affected both his analysis of plaintiff's credibility and his assessment of plaintiff's residual functional capacity.  On remand, the ALJ shall consider any additional evidence obtained from plaintiff's treating and consulting physicians and shall reevaluate plaintiff's credibility and RFC based on a complete record.

## CONCLUSION

For the foregoing reasons, the court denies plaintiff's and defendant's cross motions for judgment on the pleadings and remands this case for further proceedings consistent with this opinion.  On remand, the ALJ shall:

(1)  Re-contact Dr. Bamji and Dr. Mabida to request additional information regarding plaintiff's psychological and orthopedic impairments;

(2)  Re-contact Dr. Byrns to ascertain the clinical basis of the doctor's May 26, 2009 Medical Source Statement and to obtain additional information regarding plaintiff's psychological and orthopedic impairments;

(3)  Provide plaintiff with a meaningful opportunity to reschedule the missed consultative examinations;

(4)  Re-evaluate the weight that should be assigned to the medical opinions from plaintiff's treating physicians in light of any new evidence obtained;

(5)  Re-evaluate plaintiff's testimonial credibility, subjective complaints of pain and functional limitations, employability, and disability in light of any newly obtained information relevant to plaintiff's claims; and

      (6)  Re-evaluate plaintiff's residual functional capacity in light of any newly obtained information relevant to plaintiff's claims.

      The Clerk of the Court is respectfully requested to close the case.


**SO ORDERED.**

Dated: September 27, 2011
      Brooklyn, New York

                                    _____/s/_____
                                      KIYO A. MATSUMOTO
                                      United States District Judge
                                      Eastern District of New York